IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

LARRY W. HARRIS                                                            PLAINTIFF

VS.                              CIVIL NO. 05-6039

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION              DEFENDANT

## **MEMORANDUM OPINION**

Larry Harris ("plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration denying his applications for disability insurance benefits ("DIB"), under Title II of the Act.

**Background:**

The application for DIB now before this court was filed on August 7, 2000, alleging an onset date of June 30, 1995, due to back pain, heart problems, asbestosis, and borderline high blood pressure. (Tr. 84-86, 100, 115). An administrative hearing was held on May 16, 2002. (Tr. 30-62). The Administrative Law Judge ("ALJ"), rendered an unfavorable decision on September 17, 2002. (Tr. 13-17). However, On March 22, 2004, this Court reversed and remanded the ALJ's decision pursuant to sentence four. (Tr. 233, 239-240). A second administrative hearing was held on September 15, 2004. (Tr. 241-243, 346-365). Plaintiff was present and represented by counsel.

On June 30, 1999, plaintiff's date last insured, he was forty-eight years old and possessed an eleventh grade education. (Tr. 223). The record reveals that he had past relevant work ("PRW"), as a boiler operator, mechanic, heavy equipment operator, and automobile mechanic. (Tr. 13).

On December 1, 2004, the Administrative Law Judge ("ALJ"), found that plaintiff did not suffer from a severe impairment at any time from June 30, 1995, plaintiff's alleged onset date, until June 30, 1999, plaintiff's date last insured. (Tr. 226). On April 27, 2005, the Appeals Council declined to review this decision. (Tr. 186-188). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. The plaintiff and Commissioner have filed appeal briefs, and the case is now ready for decision. (Doc. #6, 10).

**Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of

AO72A
(Rev. 8/82)

proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**Discussion:**

In the present case, the ALJ concluded that plaintiff's impairments were non-severe. An

3

ALJ may consider an impairment to be non-severe only if a claimant's medical impairments are so slight that it is unlikely he or she would be found to be disabled even if their age, education, and work experience were taken into account. *See Bowen v. Yuckert*, 482 U.S. 137, 153 (1987). "Only those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking the vocational analysis." *Id*. at 158.

The relevant medical evidence reveals as follows. On March 29, 1995, plaintiff was admitted to the hospital after experiencing a fullness in his chest. (Tr. 129). He stated that he had experienced a syncopal episode and had fallen, hurting his right knee. (Tr. 129-130). Treatment records do not reveal a diagnosis or a course of treatment. (Tr. 129-130).

On April 3, 1995, just two months before his alleged onset date, plaintiff experienced a second syncopal episode. (Tr. 135). However, an examination of his heart and lungs was within normal limits, and an electrocardiogram ("EKG") was unremarkable. As such, a stress test was ordered. (Tr. 135). On May 3, 1995, a follow-up physical examination, including pulmonary and cardiac systems, was unremarkable. (Tr. 135). At this time, plaintiff reported no chest pain. (Tr. 135).

On November 7, 1996, plaintiff underwent a toxicology consultation with Dr. Mark Schiefer. (Tr. 172-175, 226, 361). This exam was conducted in furtherance of a lawsuit pending against his former employer for asbestos exposure. During the consultation, plaintiff reported a past exposure to asbestos, as well as a thirty-year history of smoking one package of cigarettes per day. (Tr. 173). Dr. Schiefer noted that no medical records were available for his evaluation. (Tr. 173). He did,

however, view five x-ray examinations of plaintiff's chest taken in February 1996. (Tr. 174). Based on his review, Dr. Schiefer reported no large opacities and indicated that there were shadows on the films making the chest wall pleural examination less than ideal. (Tr. 172, 174). He observed some parenchymal changes in the middle and lower lung zones that he believed could be consistent with asbestos-related pneumoconiosis. (Tr. 174). Dr. Schiefer made a provisional diagnosis of "probable asbestosis" based on plaintiff's reported history of exposure and latency; however, he opined that additional criteria, such as clinical findings and testing, were necessary to determine whether plaintiff actually had an asbestos-related disease or some other condition causing the interstitial lung changes. (Tr. 174-175).

Although pulmonary function testing performed at an unknown time in the 1990s indicated severe obstruction and low vital capacity, pulmonary function testing and an x-ray examination conducted in May 1997 were unremarkable. (Tr. 176-177). A chest x-ray dated May 13, 1997, showed no abnormalities with "no asbestos related changes," and an EKG was within normal limits. (Tr. 152, 153). Pulmonary function testing also revealed "normal spirometry" results. (Tr. 151). At this time, plaintiff admitted to smoking up to two packages of cigarettes per day and reported no specific complaints. (Tr. 148).

On May 19, 1997, plaintiff's physician reported no evidence of chronic obstructive pulmonary disease ("COPD"). (Tr. 149). Further, subsequent testing failed to confirm the diagnosis of asbestosis or reveal a worsening of plaintiff's condition. In fact, three years later, on August 8, 2002, repeat pulmonary function testing revealed only a mild pulmonary obstruction before

AO72A
(Rev. 8/82)

medication, and normal spirometry readings after medication. (Tr. 179).

On June 5, 1998, plaintiff was hospitalized with substernal chest pain and premature ventricular complexes ("PVCs"). (Tr. 155-156). He had no history of heart problems and, at the time of hospitalization, was reportedly pain-free. (Tr. 156, 158). Plaintiff's physical examination was normal. (Tr. 156, 158-159). Further, a cardiac treadmill stress test showed good exercise tolerance, no evidence of ischemic change, no symptoms of chest pain, and no clinically significant stress-induced changes. (Tr. 155, 161). Likewise, an electrocardiogram ("EKG") showed only occasional premature ventricular complexes, but was otherwise normal. (Tr. 155-156). A chest x-ray was also negative for acute disease and a computed tomography ("CT") of his chest ruled out the possibility of an aneurysm. (Tr. 155). Plaintiff was discharged on June 8, 1998, as asymptomatic, with a prescription for ACE 2 blockers and Pepcid. (Tr. 155). Dr. Mark Malloy advised plaintiff to continue with routine activity and a regular diet. (Tr. 155).

On November 2, 2000, Dr. Steve Owens, a non-examining, consultative physician, completed an RFC assessment. (Tr. 162-171). After reviewing plaintiff's medical records, he concluded that plaintiff was not suffering from a severe impairment. (Tr. 169).

Dr. Owen Clopton, a medical expert (ME) was present at the second administrative hearing on September 15, 2004. (Tr. 350). He reviewed all of plaintiff's treatment records and concluded that plaintiff did not have any disabling conditions prior to June 30, 1999, his date last insured. (Tr. 350-351). Dr. Clopton noted the pulmonary function test conducting in the 1990's that indicated severe obstruction, but stated that subsequent testing and x-rays were within normal limits.

6

Therefore, he concluded that there were questions concerning the accuracy of this particular test. (Tr. 150-151).

Although plaintiff contends that his alleged shortness of breath is disabling, he had no abnormal chest x-rays or pulmonary function tests, other than the undated pulmonary function tests and x-rays taken in February 1996, in furtherance of plaintiff's claim of asbestos exposure. (Tr. 225). Records also indicate that plaintiff smoked cigarettes for thirty years and continued to smoke approximately one package of cigarettes a day. (Tr. 42, 147-148, 225). Clearly, his continued smoking discredits his complaints of breathing difficulties. *See McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir. 2003)(finding that the plaintiff rarely sought treatment for shortness of breath and continued to smoke cigarettes); *Kisling v. Chater*, 105 F.3d 1255, 1257 (8th Cir. 1997)(failing to follow a prescribed course of remedial treatment, including the cessation of smoking, without good reason is grounds for denying an application for benefits).

Further, the records also indicate that plaintiff sought limited medical treatment during the relevant time period. (Tr. 129- 135). In 1995, plaintiff only sought treatment on a few occasions. Then, in 1996, he attended the asbestosis consultation. (Tr. 173-175). Plaintiff sought treatment on only three occasions in 1997. (Tr. 148-149, 173-175). He did have a brief hospital stay in 1998, but no additional treatment in 1999. (Tr. 155). In fact, after his date last insured, plaintiff did not seek further treatment until 2002. Clearly, this is not the medical history of someone with a severe lung or heart condition. *See Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003)(finding that the ALJ may discount subjective complaints based on a failure to pursue regular medical treatment); *Hogan*

*v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001)(finding that the time between the doctor visits did not indicate that the plaintiff was experiencing severe pain).

With regard to plaintiff's borderline high blood pressure, we note that his readings were as follows. On April 3, 1995, his blood pressure was 134/86, and on May 3, 1995, his blood pressure was 138/82. (Tr. 135). On June 5, 1998, plaintiff's blood pressure was 140/100, and later that day measured at 120/80. (Tr. 155, 159). According to case law, plaintiff's blood pressure levels are too mild to be considered a severe impairment. *See Murphy v. Sullivan*, 953 F.2d 383, 386 (8th Cir. 1992)(finding that the plaintiff's high blood pressure at 170/90 at its highest point failed to rise above the moderate level for hypertension, and therefore, was not a severe impairment); *Brown v. Heckler*, 767 F.2d 451, 453 (8th Cir. 1985)(finding that the plaintiff's blood pressure measured in the mild or moderate range of hypertension, and therefore was not disabling).

Records also indicate that plaintiff was taking only occasional aspirin and was briefly prescribed ACE 2 inhibitors as a preventative measure after his June 1998 hospitalization for unexplained chest and back pain. (Tr. 155, 225). At that time, his activities and diet were left unrestricted. (Tr. 155). As of August 2000, plaintiff reported that he was only taking the over-the-counter pain medication Vanquish. (Tr. 105, 115). In fact, records indicate that plaintiff continued to take aspirin and Vanquish for his symptoms until August 30, 2001, three years after the expiration of his insured status, when he reported that he was first prescribed Celebrex for back and joint pain and an Advair inhaler for shortness of breath. (Tr. 46, 127). We note that the use of only nonprescription pain medication is inconsistent with complaints of disabling pain. *See Riggins v.*

8

*Apfel*, 177 F.3d 689, 693 (8th Cir. 1999).

The absence of physician ordered restrictions further contradicts plaintiff's subjective complaints. (Tr. 155, 225). *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001). In disability reports filed with his application in August 2000, plaintiff reported an ability to do the laundry, wash dishes, change the sheets, vacuum/sweep, take out the trash, prepare meals, run certain errands, pay the bills, count change, use a checkbook, and sometimes drive. (Tr. 113-114). At the first administrative hearing, on May 16, 2002, plaintiff testified that he was able to wash dishes, make the bed, cook, and do laundry. (Tr. 52). He has also reported an ability to care for his personal hygiene, attend church, read, and sometimes watch television, listen to the radio, and visit friends and family. (Tr. 52, 113-114). Clearly, this level of activity raises suspicions concerning the severity of plaintiff's condition. *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d 669, 671 (8th Cir. 1995) (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).

In addition, plaintiff's reasons for quitting his job also fail to support his contention of a severe impairment. At the first administrative hearing, on May 16, 2002, plaintiff testified that he took early retirement from his job with Reynolds Metals in 1992, to see if he could physically

recover from his alleged heart and back problems. (Tr. 35, 37). However, at the second hearing, in September 2004, plaintiff testified that he stopped working in 1992 because the Reynolds plant was shut down. (Tr. 362-363). He indicated that he had received unemployment benefits from 1992 until 1994, at which time he elected to retire. (Tr. 362-363). *Johnson v. Chater*, 108 F.3d 178, 180-181 (8th Cir. 1997) (quoting *Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir. 1991) (holding that "a claimant may admit an ability to work by applying for unemployment compensation because such an applicant must hold himself out as available, willing, and able to work"). His testimony clearly suggests that he left his job due to the closing of the plant and a subsequent decision to retire, as opposed to health related reasons. *See Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992)(finding that the plant closing caused the plaintiff to stop working, not his physical condition).

Plaintiff testified that he started looking for a new job in 1994, and was hired by the United States Post Office in April 1995, which he left after a few months because he "couldn't do [the job] to suit them." (Tr. 37-39). We note that plaintiff's ability and willingness to perform some level of work activity also discredits his allegations of total disability. *See Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)(finding that the plaintiff's intention to return to work tended to prove that he is able to work); *Starr v. Sullivan*, 981 F.2d 1006, 1008 n. 3 (8th Cir. 1992)(finding that although the work did not amount to substantial gainful activity, it is determinative of whether the plaintiff had the capacity to work). Accordingly, we find substantial evidence to support the ALJ's determination that plaintiff did not suffer from a severe impairment during the relevant time period.

10

**Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

DATED this 10th day of August 2006.

/s/ Bobby E. Shepherd
HONORABLE BOBBY E. SHEPHERD
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)